# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 8, 2009 Session

## STATE OF TENNESSEE v. CHARLOTTE YVONNE TURNER

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Obion County**
**No. C07-192      William B. Acree, Jr., Judge**

---

**No. W2007-01590-SC-R11 - Filed October 15, 2009**

---

SHARON G. LEE, dissenting.

I respectfully disagree with the majority. In my view, the police officers' search of Ms. Turner's residence without reasonable or individualized suspicion violates article I, section 7 of the Tennessee Constitution. While the United States Supreme Court has ruled in <u>Samson v. California</u>, 547 U.S. 843 (2006), that such a search, without reasonable or individualized suspicion, does not violate the Fourth Amendment to the United States Constitution, I would hold the Tennessee Constitution provides a greater degree of protection against suspicionless searches than does the federal Constitution.

## I.

Article I, section 7 of the Tennessee Constitution provides:

> [T]he people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

Although this Court has stated that the Tennessee provision is "identical in intent and purpose with the Fourth Amendment," <u>Sneed v. State</u>, 423 S.W.2d 857, 860 (Tenn. 1968), we have also noted that our search and seizure law has "developed independently from federal law." <u>State v. Richards</u>, 286 S.W.3d 873, 877 (Tenn. 2009). Thus, where "there has been a settled development of state constitutional law which does not contravene the federal, we are not inclined to overrule earlier

1

decisions unless they are demonstrably erroneous." State v. Lakin, 588 S.W.2d 544, 549, n.2 (Tenn. 1979) (noting that Tennessee decisions applying a particular phrase of search and seizure law are "somewhat more restrictive than" federal case law). Furthermore, even where there is no "settled development of state constitutional law," we may decline to follow federal precedents when they are "inadequate" to serve the purposes of article I, section 7. State v. Jacumin, 778 S.W.2d 430, 435-36 (Tenn. 1989) (rejecting the federal "totality of the circumstances" test for a criminal informant's reliability in favor of the two-pronged "basis of knowledge" and "veracity" test); see also Richards, 286 S.W.3d at 877-78; State v. Cox, 171 S.W.3d 174, 183 (Tenn. 2005) (stating "[w]e are free to interpret the provisions of our state constitution to afford greater protection than the federal constitution."); State v. Randolph, 74 S.W.3d 330, 335 (Tenn. 2002) (noting that "this Court has not hesitated to extend greater privacy protections to the citizens of this State when appropriate under article I, § 7"); State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (stating "we recognize, as we have in the past, that article I, section 7 may afford citizens of Tennessee even greater protection").

## II.

This Court, following the U.S. Supreme Court's lead in Samson, today holds that law enforcement officials may detain a parolee subject to a warrantless search condition "without reasonable or individualized suspicion," and may search both the parolee's person and his or her residence, even if the search of the residence is remote in time and distance from the point of detention.

While I agree that a person who has been convicted of a felony should be and is subject to a different analysis of what is a "reasonable" search, a rule that effectively gives police officers complete and unfettered power to detain and search a citizen, with no cause, reason, or suspicion, goes too far in my view. Further, as a practical matter, the Court's blanket approval of suspicionless searches of parolees results in a loss of meaningful judicial oversight and review of police power to search and seize parolees. While the Court observes that a search "motivated by personal animosity" or with an abusive or harassing purpose may be unreasonable, it will be a rare instance when a police officer admits such a motivation. Far more often, the trial court will be presented with a variation of what Officer Palmer said in this case: when asked what justification he had to send Ms. Turner back to her house and search her home, he responded, "[t]he conditions of her parole and the rulings of the United States Supreme Court." When such a justification suffices to pass constitutional muster, more will rarely, if ever, be offered.

I believe that a requirement of reasonable suspicion to search a parolee, a lower bar than the traditional probable cause and search warrant requirement, strikes a more appropriate balance between the individual's right to be free from unreasonable searches and the government's legitimate interest in preventing crime. I agree with the Samson dissent rejecting "the conclusion, reached by the Court here for the first time, that a search supported by neither individualized suspicion nor 'special needs' is nonetheless 'reasonable.'" Samson, 547 U.S. at 858 (Stevens, J., dissenting). This conclusion, that a "*suspicionless*" search of a parolee is not unreasonable, means that an officer need

demonstrate no cause, reason, nor scintilla of justifying suspicion to search a person he or she knows to be on parole under the "standard" parole condition imposing a warrantless search term. Further, even if a personal search of a parolee yields neither evidence nor suspicion of wrongdoing, the police officer may then insist on being taken to the parolee's residence, even if distant from the stop, in order to search the parolee's home. As the Samson dissent aptly noted, "[t]he suspicionless search is the very evil the Fourth Amendment was intended to stamp out." Id.

In the present case, the majority recognizes, correctly in my opinion, that "a suspicionless search could be characterized as 'arbitrary.'" Indeed, it is hard for me to see how a search that is truly "suspicionless" could not fairly be characterized as "arbitrary" and "capricious" in nearly every circumstance. Nevertheless, the Court, utilizing the "totality of the circumstances" test, concludes that an arbitrary search of a parolee may pass constitutional muster, notwithstanding our established and repeated observation that "[t]he *essence of the prohibition against unreasonable searches* and seizures under the Fourth Amendment is to 'safeguard the privacy and security of individuals against *arbitrary* invasions by government officials.'" Randolph, 74 S.W.3d at 334 (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)) (emphasis added); see also State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001); Downey, 945 S.W.2d at 106.

**III.**

The various rationales relied upon by the Samson Court to support this conclusion, and adopted by this Court today, have been thoroughly critically analyzed by Professor Wayne R. LaFave, who states in part as follows:

> In balancing the interests in Samson, the majority relied principally upon these considerations: (i) "that parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is"; (ii) that "the parole search condition under California law – requiring inmates who opt for parole to submit to suspicionless searches by a parole officer or other peace officer 'at any time' – was 'clearly expressed' to" Samson; (iii) that the state "has an 'overwhelming interest' in supervising parolees because 'parolees … are more likely to commit future criminal offenses,' as manifested by the fact "California's parolee population has a 68–to–70 percent recidivism rate"; and (iv) that the "concern that California's suspicionless search system gives officers unbridled discretion to conduct searches * * * is belied by California's prohibition on 'arbitrary, capricious or harassing' searches."
>
> But each of these points is open to serious dispute. As to (i), it comes dangerously close to acceptance of the discredited "constructive custody" and "act of grace" theories; it hardly follows that parolees are subject to suspicionless searches because inmates are, even though (as even the dissenters acknowledge), there is "some" difference in the state's interest vis-a-vis parolees generally as compared to probationers generally. As for (ii), just as in [United States v.]Knights[, 534 U.S. 112

3

(2001)] this is nothing more than circular reasoning; while the majority contends that because of the notice to Samson of the state law mandating that parolees submit to suspicionless searches he "did not have an expectation of privacy that society would recognize as legitimate," the dissenters correctly assert that the "mere fact that a particular State refuses to acknowledge a parolee's privacy interest cannot mean that a parolee in that State has no expectation of privacy that society is willing to recognize as legitimate." As for (iii), it is essentially the same one-size-fits-all conclusion as was reached in Knights, except that it is worse because the "size" deemed appropriate for *all* parolees is suspicionless searches, while in Knights the "size" for probationers was reasonable suspicion instead of probable cause (at least for residence searches). The problem, as the Samson dissenters aptly put it, is that "the search condition here is imposed on *all* parolees – whatever the nature of their crimes, whatever their likelihood of recidivism, and whatever their supervisory needs, – without any programmatic procedural protections."

. . .

As for point (iv) in Samson, here is a matter that clearly goes beyond Knights, which only approved of searches made upon reasonable suspicion. . . . The majority says the "dissent's claim that parolees * * * are subject to capricious searches conducted at the unchecked 'whim' of law enforcement officers" ignores the provision in California law (which, by virtue of Samson appears to now be the Fourth Amendment floor on parolee searches) by which a parolee search is reasonable only so long "as it is not arbitrary, capricious or harassing." Of course, as the dissent notes, *the traditional means under the Fourth Amendment of dealing with that problem has been the "requirement of individualized suspicion," and one can only wonder whether any lesser standard can provide a meaningful check upon police activity directed toward parolees*. Considering that the facts of Samson were readily found to meet the "not arbitrary, capricious or harassing" test by the California court, there is some reason for pessimism.

5 LaFave, Search and Seizure, § 10.10 (4th ed. 2004) Supp. 2008-09 at 31-33 (footnotes omitted) (final emphasis added).[1]

As did the Samson Court, the majority relies on the assertion that "parole is more akin to

---

[1] For further scholarly criticism of the Samson reasoning and holding, see Harvard Law Review, *The Supreme Court, 2005 Term - Leading Cases*, 120 Harv. L. Rev. 183, 188 (Nov. 2006) (Noting, among other things, that "[i]f the Samson Court meant to give California unbridled discretion in parolee searches, then the flimsiness of the California standard is not a problem, but if the Court did not intend to grant this level of discretion, it should have provided more explicit guidance in the opinion."); Rachael A. Lynch, *Two Wrongs Don't Make a Fourth Amendment Right: Samson Court Errs in Choosing Proper Analytical Framework, Errs in Result, Parolees Lose Fourth Amendment Protection*, 41 Akron Law Review 651 (2008); John Lassetter, *Samson v. California: "Evil" Suspicionless Searches Become a Part of Everyday Life for Parolees*, 25 Law & Inequality 539 (Summer 2007).

imprisonment than probation is to imprisonment" in support of its conclusion that all parolees, irrespective of individual circumstance, are subject to suspicionless searches. This observation is certainly true as far as it goes; but in my view, the far more pertinent fact is that the situations and circumstances of both parolees and probationers are much more similar to free citizens than to incarcerated prisoners. As LaFave aptly notes:

> [I]n most cases the life of a parolee more nearly resembles that of an ordinary citizen than that of a prisoner. The parolee is not incarcerated; he is not subjected to a prison regimen, to the rigors of prison life and the unavoidable company of sociopaths. He does not live in a society whose violent, though usually repressed, mores necessitate iron bars and the close watch of armed guards. Routine searches are necessary in prison to prevent dangerous riots and internal violence. Such searches are impersonal and, because a prisoner's possessions are limited, unintrusive. A parolee, however, lives in a different environment, one where such problems are absent and searches and seizures are intrusive. The parolee lives among people who are free to come and go when and as they wish. Except for the conditions of parole, he is one of them. His parole represents supervision, rather than repression; and his parole officer is, ideally, an advisor, rather than an armed watchman. If the parole officer is to be the parolee's personal prison guard, it is only because the court decides that he is, and such a decision stands on extraordinarily shaky ground.

5 LaFave, Search and Seizure, § 10.10(a) at 436 (4th ed. 2004) (quoting William R. Rapson, *Extending Search-and-Seizure Protection to Parolees in California*, 22 Stan. L. Rev. 129, 133 (1969)).

The Court also relies on the assertion that the "award of parole to an incarcerated prisoner is a privilege and not a right," describing parole as a "privilege" in four separate instances. This description is unquestionably true, but does nothing to further the analysis. Surely there are constitutional limits on what rights may be reduced or taken away from a parolee. The question is not whether the State may award or refuse to award parole, but whether, after parole is granted, the State may search the person and home of the parolee without any reasonable, articulable, or individualized suspicion of wrongdoing. As the Supreme Court observed in Morrissey v. Brewer, 408 U.S. 471, 482 (1972), "[i]t is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a 'right' or a 'privilege.' By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment." See also Graham v. Richardson, 403 U.S. 365, 374 (1971) (stating that "this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege'").

## IV.

Even though Samson has decisively settled the issue of suspicionless parolee searches under the Fourth Amendment, Tennessee and our sister states clearly remain at liberty to establish a higher

5

threshold than the "zero suspicion" floor established by California. The United States Court of Appeals for the Tenth Circuit recognized this in <u>United States v. Freeman</u>, 479 F.3d 743, 747-48 (10th Cir. 2007), observing that

> The [<u>Samson</u>] Court noted "that some States and the Federal Government require a level of individualized suspicion," and strongly implied that in such jurisdictions a suspicionless search would remain impermissible. [<u>Samson</u>, 126 S.Ct.] at 2201. Parolee searches are therefore an example of the rare instance in which the contours of a federal constitutional right are determined, in part, by the content of state law.
>
> . . .
>
> <u>Samson</u> does not represent a blanket approval for warrantless parolee or probationer searches by general law enforcement officers without reasonable suspicion; rather, the Court approved the constitutionality of such searches only when authorized under state law. Kansas has not gone as far as California in authorizing such searches,[2] and this search therefore was not permissible in the absence of reasonable suspicion.

<u>Id.</u>

> As <u>Freeman</u> notes, the <u>Samson</u> Court stated that
>
> Petitioner observes that *the majority of States and the Federal Government have been able to further similar interests in reducing recidivism and promoting re-integration, despite having systems that permit parolee searches based upon some level of suspicion*. Thus, petitioner contends, California's system is constitutionally defective by comparison. Petitioner's reliance on the practices of jurisdictions other than California, however, is misplaced. *That some States and the Federal Government require a level of individualized suspicion is of little relevance to our determination whether California's supervisory system is drawn to meet its needs and is reasonable*, taking into account a parolee's substantially diminished expectation of privacy.

---

[2] At the time of the search of Ms. Turner's house and her arrest, Tennessee had not gone as far as California in authorizing such searches either: her parole condition provided for "a search, without a warrant, of [her] person, vehicle, property, or place of residence . . .," whereas California's parole condition provided for "'search or seizure by a parole officer or other peace officer at any time of the day or night, with or *without a search warrant and with or without cause*.'" <u>Samson</u>, 547 U.S. at 846 (emphasis added) (quoting Cal. Penal Code Ann. § 3067(a) (West 2000)). Neither parole condition mentions or precludes "reasonable suspicion," a standard that is clearly legally distinct from probable cause, the standard ordinarily required to support a search warrant. Of course, if the Tennessee Board of Probation and Parole follows the Court's suggestion at footnote 12 of the opinion to "consider revising its standard conditions to reflect explicitly that parolees may be searched without either a warrant or any particularized suspicion," Tennessee will then have gone as far, if not farther, than California in authorizing suspicionless parolee searches.

6

<u>Samson</u>, 547 U.S. at 855 (emphasis added). As <u>Samson</u> then recognized, "a majority of states and the Federal Government" had established a threshold of reasonable, individualized suspicion to justify a parolee search. Several state courts have revisited the issue subsequent to the <u>Samson</u> decision and adhered to a reasonable suspicion requirement. <u>See</u> <u>Sierra v. State</u>, 958 A.2d 825, 829 (Del. 2008); <u>State v. Bennett</u>, 200 P.3d 455, 462-63 (Kan. 2009); <u>Commonwealth v. Hunter</u>, 963 A.2d 545, 551-52 (Pa. Super. Ct. 2008).

**V.**

Pursuant to the above analysis, I would hold that the Tennessee Constitution requires a showing of reasonable suspicion to search a parolee. Article I, section 7 of the Tennessee Constitution, in addition to providing its citizens protection "from unreasonable searches and seizures," also expressly proscribes "general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed." I believe a reasonable interpretation of this prohibition includes the issuance of a warrant to search a place in the complete absence of reasonable or individualized suspicion. If this provision disallows a law enforcement officer to search a place without evidence providing reasonable suspicion pursuant to a general warrant, it is reasonable to construe it as disallowing an officer to search a residence without reasonable suspicion and without a warrant. "Reasonable suspicion is not an overly-burdensome standard of proof." <u>Bennett</u>, 200 P.3d at 463. A requirement of reasonable suspicion does, however, strike a more appropriate balance between the privacy interests of the individual and the State's interest in minimizing recidivism and preventing crime, by providing a meaningful check on otherwise unfettered police power to conduct suspicionless and arbitrary searches, and preserving some degree of meaningful judicial oversight and review in order to curb potential abuses of this governmental power.

For the aforementioned reasons, I respectfully dissent.

_____
SHARON G. LEE, JUSTICE

7